[Civ. No. 8226.   Third Dist.   May 25, 1954.]

SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT, Plaintiff and Respondent, v. WALLACE B. TRUSLOW et al., Appellants; FRANK E. KING, Defendant and Respondent.

Earl S. Patterson, William B. Borthwick, Wm. P. Mealey, Carl E. Rodegerdts, Chalmers, Cowing & Sans, E. L. Means and James F. Roach for Appellants.

Edmund G. Brown, Attorney General, Walter S. Rountree, Assistant Attorney General, Raymond H. Williamson and John Morris, Deputy Attorneys General, and Robert W. James, Assistant Administrative Adviser, State Reclamation District, for Plaintiff and Respondent.

Mento, Buchler & Littlefield and George K. Littlefield for Defendant and Respondent.

VAN DYKE, P. J.—Basically, the Sacramento-San Joaquin Drainage District was created and is operated for the purpose of carrying out a general flood control project for the Sacramento and San Joaquin Rivers and their tributaries. The waters discharged into these streams at flood times are far in excess of the carrying capacity of the river channels. In the Sacramento Valley, to supplement this carrying capacity, lands have been set aside as by-passes in which the excess waters may be carried. The Yolo By-Pass is a part of this system. It takes water from the Sacramento River, carries it down westerly of the river channel and empties it back into the river at a lower point. This by-pass is in part located in Yolo County and Cache Creek empties into the by-pass area at a point in that county. This creek brings water from Clear Lake and Indian Valley lying in the westerly mountains. It is the largest sediment-carrying stream on the west side of the valley and if uncontrolled would drop its

sediment in such a way as to block the operation of the by-pass. As a part, therefore, of the entire plan of handling the flood waters in the valley a settling basin for Cache Creek was selected to take the sediment out of its waters. When the waters of the creek have deposited their sediment they are admitted into the by-pass over a low levee. It was necessary in the operation of the settling basin to direct the flow of Cache Creek into the basin, as the tendency of the stream was to drop its sediment quickly when its waters were slowed and thus build a ridge or elevated bed of deposits extending out across the settling basin and to the by-pass. Waters of the creek were controlled by training levees constructed so as to best utilize the capacities of the basin; as time went on two outlets were used to the limit and a third became necessary.

This action was brought to condemn a right of way to build this third outlet or throat. The district by resolution declared it was necessary that a further right of way easement be acquired for the purpose ''of a diverting channel and training levees for the diverting of Cache Creek into Cache Creek Settling Basin and the taking of necessary materials therefor.'' It more particularly described the property sought to be taken as ''an additional right of way and easement for the construction and perpetual maintenance of said channel and training levees . . . with the right to take materials for the construction thereof.''

Appellant Wallace B. Truslow owned some 1,900 acres of land lying within the settling basin and generally concerning the title situation between the district and Truslow the findings of the trial court disclosed the following: In January of 1935 the district purchased from Truslow's predecessor in interest a perpetual right and easement without recourse to compensation for damage therefrom for the passage of all flood waters of the Yolo By-Pass which might from time to time inundate some 3,000 acres particularly described in the conveyance to the district and located in the settling basin. There was granted to the district rights of way for construction of levees of the flood control project, described as ''(a) Right of way for construction of the westerly training levee of Cache Creek Settling Basin, said right of way being 200 feet, more or less, in width, . . . ; (b) Right of way for the construction of the easterly training levee of the Cache Creek Settling Basin, said right of way being 250 feet

more or less in width, . . . ." Again, on January 24, 1940, Truslow's predecessor in interest conveyed to the district a perpetual right and interest without recourse to compensation for damages therefrom for the passage of all flood waters of the Yolo By-Pass which might from time to time inundate the grantor's lands. On February 23, 1940, for additional compensation Truslow's predecessor in interest granted additional easements to the district which included "a perpetual right of way and easements to build, construct . . . and forever maintain the west training levee of the Cache Creek Settling Basin, a part of the Sacramento River Flood Control Plan of the California Debris Commission," over certain lands therein described. This conveyance included "the perpetual right and easement, without recourse to compensation for damage therefrom, . . . for the passage, retention and settlement of all flood waters of Cache Creek and Yolo By-pass, which may from time to time inundate, . . ." the lands of the grantor. Thereafter appellant Truslow became the owner of three sections of land within the settling basin subject to the aforesaid easements and flowage rights. By the present action, which, as we have said, was intended to provide for the construction of a third throat out of Cache Creek and into the settling basin to be situated west of the preceding two throats, the district sought to condemn an easement over 234 acres of Truslow lands. The district took immediate possession and constructed the channel and training levees.

The greater part of Truslow's lands were leased to respondent King. This lease covered 161 acres of the 234 acres lying in the easement area. His lease had four years to run. The cause was tried to the court sitting without a jury. After fixing the value of the property taken, the court separately assessed the interests therein of Truslow and King and so apportioned the total award between them. In addition the court awarded to King certain special damages. From the judgment Truslow appeals.

When the action was brought all of Truslow's lands were burdened by reclamation assessments levied by Reclamation District 2035. After levying the assessment the reclamation district issued bonds. The total of assessments underlying the bonds and constituting a lien on the lands in the district amounted to $2,264,740. None of the bonds have yet matured. The reclamation district was made a defendant in the condemnation actions, its interest being alleged to be that of the holder of assessment liens upon the property sought to

be taken. The district appeared and took the position that the security of the bonds would be affected by the granting of the relief sought by the district in its action and that, consequently, some provision would have to be made to protect its interest and the interest of the bondholders. Roy E. Cole, as Treasurer of Yolo County, appeared as an interested party. The bondholders were not made parties to the suit. The trial court found, however, that the security for the payment of the lien would not be lessened, and consequently gave no relief to the district. The district and Cole have separately appealed from that portion of the judgment which so decrees.

## THE APPEAL OF TRUSLOW

Appellant Truslow attacks the entire judgment by claiming that the same is invalid for indefiniteness and failure to decide all of the issues presented in the case. More specifically he makes the following points: 1. That the district attempted to procure an easement upon Truslow's lands free and clear of the lien of the bond issue thereon and that the judgment "wholly fails to reflect the court's findings of any of the facts with regard to the bond issue and the lien thereof or the non-joinder of parties." The attack is not warranted. The court specifically found that the district was entitled to take the incorporeal interest free and clear of the lien of the assessment and bonds, basing its action upon its finding that the value of the interest taken had been more than offset by the benefit conferred by the construction of the improvement proposed (this construction had been completed before the trial was held), with the result that there had been no lessening of the security underlying the bonds. For that reason no security provisions were made with respect to the reclamation district. The court decreed that the property rights taken in the suit were free of any demands arising under the liens which had theretofore been impressed upon the land over which the easements were condemned. The propriety of this action of the court will be treated when we turn attention to the appeal of the district. We are here concerned only with the claim that the judgment did not determine things which necessarily had to be determined to dispose of all of the issues presented to the court. Truslow makes another specific claim of failure on the part of the trial court to dispose of the pertinent issues. It appeared during the trial that in the construction of the new training levees the soil necessary to construct the same was borrowed

from the lands within the area of the easement. ■ Truslow complains that this was a taking of property unauthorized by the law; that plaintiff had not even attempted to obtain title to the soil so removed from its initial location and used in the construction of the levees. However, this claim ignores the plain allegations of the complaint and the findings of the court. The easement was in part for the purpose of constructing the training levees in accordance with the plans therefor as indicated in the pleadings. The rights taken included the right to borrow soil from alongside the proposed location of the levees and within the easement area and to pile and shape that soil so as to create the levees themselves. The right to do these things was part and parcel of that which was condemned and paid for. Truslow complains that the district could not under the law "acquire the soil upon defendant's land by way of easement." The district did not seek such a right and has not used such a right. It did seek and got the right to use the soil in order to construct the levees. The evidence does not show that any soil was removed from the easement area nor otherwise moved at all except for the avowed uses for which the easement was taken. The respondent district obtained and claimed no title to the soil itself and the effect of the judgment is not to give it any such title. We think that the trial court disposed of all the issues made and presented to it by the pleadings and by the proof.

■ During the tenancy of respondent King he had, prior to the initiation of the condemnation action, drilled a water well from which he could irrigate some 300 acres of land, part of which lay within the easement area and the rest of which lay without. This well cost King $4,555. The court found that by the construction of the district's improvements on the easement area and the use being made of that area the usefulness of the well had been completely destroyed. It awarded King the cost of the well as "special damage," not payable out of the general award. The lease provided as to wells constructed by King that at the termination of his lease he might remove pumps and pumping machinery, exclusive of casing; and that he could not remove pump houses and engine blocks, the removal of which might impair the usefulness of the well. Truslow argues that from these provisions of the lease it is apparent the well in question belonged to Truslow as a part of his fee estate and that the value of the well should, therefore, be paid entirely to him. We are

not here concerned with the propriety of the court's action in awarding "special damage" to King, representing the cost of the well paid by him. The respondent condemnor contended throughout that no allowance should be made separately by reason of the destruction of the well, but is not appealing from the award made to King. As to appellant Truslow, however, his interest in the well was not separable from his interest in the real property of which it was a part and we must assume here that whatever added value the well gave to the freehold was considered in fixing the total award payable by the respondent district for the property taken. Truslow cannot complain that the cost of the well to King was awarded to him as "special damage." This award did not lessen the award made for the property taken. Indeed, one of Truslow's witnesses on value testified that in his opinion the well was worth $5,000 and that he had taken such an amount into consideration in his estimate of the value of the easement sought to be condemned upon Truslow's property.

Appellant Truslow contends that the amount of damages paid to respondent King under the findings as to the value of his leasehold interest is entirely disproportionate with the amount of damages paid to appellant Truslow as owner of the land over which the easement was taken. In fixing the value of the interests of Truslow and King in the property taken and thus the total award, the trial court applied the rule laid down in *City of Pasadena* v. *Porter*, 201 Cal. 381, 397 [257 P. 526, 53 A.L.R. 679]. The trial court found as a fact, and it is not claimed by appellant Truslow that the finding was not amply supported, that although the district was condemning an easement, yet the nature and use thereof were such that the entire value of the land within the easement was taken. It therefore, for the purpose of fixing damages for the taking and the apportionment of the award between the owner and his tenant, applied the same rule which under the cited decision is applicable where a fee is condemned. The rule was stated in the opinion in that case as follows:

". . . According to the majority of the decisions the taking of the entire demised property by condemnation proceedings operates to release a tenant from liability for subsequently accruing rent, but a taking of a portion only does not terminate the lease or absolve the lessee of his

covenant to pay the full rent. . . . '. . . in such case the lessee would not be entitled to apportionment or an abatement of the rent for the part of the land taken, but was bound to pay rent for the whole of the premises demised. . . . If the covenant to pay rent is not affected by the proceedings and judgment of condemnation, it is clear that the lessor would be entitled as compensation only to the present value of his reversion, which he holds subject to the term created by the lease; and the lessee continuing personally liable but losing his estate, and right to its enjoyment, would be entitled to receive not merely the value of the term, but also a sum of money equivalent to the present value of the sum of the rents payable in futuro. That is, he should receive the value of his term subject to the rent, and such further sum as would be considered a present equivalent for the rent thereafter to be paid, and the lessor would receive correspondingly less.' ''

Applying this rule, the trial court found that the value of King's unexpired term fixed as of the date the summons in the action was issued amounted to $19,020; the court further found that the sum of $8,350 represented the rent still to be paid by King on the condemned land for the balance of his term. As to both Truslow and King the trial court found that neither was entitled to specific severance damages for the reason that the benefits conferred by the construction of the works in accordance with the plans as stated in the complaint exceeded the severance damage which consisted only of loss of access. The court further found that the value of all the property taken was the sum of $50,000 and that the value of Truslow's reversionary interest was the sum of $22,630. The court additionally awarded to King special damages, one item of which we have hereinabove discussed, but since these awards of special damages do not affect appellant Truslow and since the condemnor is not appealing, we need discuss them no further.

It appeared from the evidence that when King rented lands from Truslow the lands were in the main what was described as a jungle, being overgrown with trees and brush. The surface of these lands was mostly irregular and much of the area had been gullied by the action of the waters of Cache Creek pouring out through the two throats and depositing sediment. By the lease King was required to clear and level the leased lands and put them in state for farming, all of which work had been done before this action was begun.

King had been farming the leased land, which included the area condemned, for several years and had produced various crops, including row crops. That part of the rental which consisted of the cost of clearing and leveling had theretofore been paid so that when this action was begun the amount of rental still to be paid on the land taken was a cash rental of $12.95 per acre. Witnesses testified that due to the productivity of the soil, which the court found to be good soil, the value of King's leasehold estate for the remainder of his term amounted to $42.50 per acre per year of the four years remaining in the unexpired term. ■ The trial court adopted these figures and the testimony supports the court's conclusion. This finding takes into consideration what amounted to a prepayment of rent through the clearing and leveling work done by King. The issue presented is wholly one of fact and since the evidence in the record supports the finding of the trial court that finding must be approved on appeal.

■ Finally, appellant Truslow contends that the trial court erred in refusing to reopen the case during the period of submission before judgment, to permit evidence that after trial King had forfeited his lease for nonpayment of rent and also had assigned all of his interest in the entire award.

The taking of evidence was concluded on January 25, 1951. The motion to vacate the submission was heard on September 17, 1951. The motion was made on specific grounds as follows: That King had made the assignment above mentioned on or about June 1, 1951; that King had failed to pay the rental of the property leased from and after November 1, 1950, failing to pay the installment which was due on May 1, 1951, in the amount of $9,203.52; that Truslow by legal action, after due notice under the lease, had terminated the lease. It was the position of Truslow that as a legal consequence of the termination of the lease King was not entitled to recover and have paid to him out of the award otherwise payable to Truslow rental accruing after termination and was not entitled to the amount of damages fixed by the court for the loss of his estate for years by condemnation, but was only entitled to recover for the loss intermediate the date the summons in the action was issued and the date of termination, to wit, July 6, 1951. The motion was heard by the court and the minutes of the court show that during the argument counsel for King ''offered to pay the rent on real property

at the rate of $12.95 per acre per year for three (3) years, said amount to be paid out of the judgment when said judgment is paid over to defendants.'' The minutes show that the court ''denied defendant Truslow's motion to vacate submission upon the condition that defendant King pay the amount so offered.'' These provisions were not carried into the judgment thereafter rendered and herein appealed from and we are not informed as to the reasons therefor. We will, therefore, treat the denial of the motion as unconditional for the purposes of this appeal only since we believe that the trial court was warranted in refusing to vacate the submission. Section 1248 of the Code of Civil Procedure provides as follows: ''The court . . . must hear such legal testimony as may be offered by any of the parties to the proceedings, and thereupon must ascertain and assess: 1. The value of the property sought to be condemned . . . and of each and every separate estate or interest therein; . . .'' Section 1249 of the Code of Civil Procedure provides: ''For the purpose of assessing compensation and damages the right thereof shall be deemed to have accrued at the date of the issuance of summons and its actual value at that date shall be the measure of compensation for all property to be actually taken, . . .'' The court was thus statutorily bound to fix the compensation and damages payable to King for his estate for years as of the date summons issued. This statutory mandate the court obeyed and in doing so it applied settled rules hereinbefore discussed in ascertaining the value of the separate estates of Truslow and King. Neither the assignment made by King nor his failure to pay rent and the legal action taken by Truslow based thereon, under which we may assume Truslow repossessed himself of the property, were matters which could affect the assessment of compensation and damages. ■ The entire scheme for the exercise of the power of eminent domain through action to condemn is statutory and the statutes cannot be departed from in matters wherein their commands are specific. If when the assignment was made the right to the moneys assigned and which would become payable upon final judgment in the cause belonged to King there was nothing to prevent his assignment thereof nor to justify any preventive action on behalf of Truslow. If, as it is claimed he did, King, after the date for the assesment of compensation and damages, failed to pay his rental thereafter accruing, adequate remedies were afforded by the law to Truslow, including, if he chose to exercise it, the right to declare the

lease forfeited for such default, of which right he elected to avail himself. But these matters occurring after the date for the assessment of values were not properly before the court in the condemnation action. ■■■ The court was required, as we have said, to separately value the estates of Truslow and King and each man was entitled to receive the amount thus ascertained as his compensation for that which he lost. The rule laid down in *City of Pasadena* v. *Porter, supra,* is a rule to be used in determining the value of the tenant's estate. The sum of the value of the separate estates makes up the total value of the property taken. But in obeying the statutory command that the value of the interests in the land taken be separately determined the court was not engaged in an equitable distribution of the whole value of the property taken as between persons having undefined and unascertained claims thereto. King was entitled, just as was Truslow, to have the value of his interest in the land taken assessed and he was equally entitled to have the sum fixed paid over to him. This amount could not be varied because of matters arising between himself and Truslow after the date as of which the assessments of value must be made. The court was therefore justified in the denial of Truslow's motion.

■■■ While this appeal was pending appellant Truslow presented to this court a motion that it take evidence touching the matter of the trial court's findings that severance damage was more than offset by benefits resulting to the land from the construction of the training levees; that the judgment of the trial court be modified in accordance with the evidence so adduced upon a rehearing of that issue; that in the alternative the case be in its entirety reversed and remanded to the trial court for retrial in accordance with instructions as to legal issues raised upon Truslow's appeal. In support of and in opposition to the motion various affidavits were filed by the parties and depositions of witnesses were taken and supplied to the court. We have determined that the motion must be denied and it is accordingly so ordered. We will state our reasons for this ruling.

Before this action was begun and the third throat for the influx of Cache Creek waters into the settling basin had been constructed under the easements taken there had been a use of the basin for many years and a controlling of the outflow of waters into it by two other throats successively constructed. There had first been constructed a permanent levee as dis-

tinguished from training levees, which permanent levees served as a barrier against the waters of Cache Creek flowing into the lands north of the settling basin. Then there had been a pair of training levees carrying Cache Creek waters over to the northerly portion of the basin. The use of these levees resulted in a deposit of sediment 6 to 8 feet deep in the most northerly part and gradually thinning out to lesser depths as the waters flowed southerly in the basin, dropping their lessening burden of silt as they went. When a portion of the basin had been utilized in this manner the second throat was constructed westerly of the first and the process repeated. The evidence showed that when the present training levees were constructed the lands that had been built up by the deposit of soil carried down into the basin by Cache Creek were susceptible of increased use thereof over the use possible before the fill had been made. These lands had in part been so utilized. But the periodic flow of Cache Creek through the second throat limited the period of the year during which the lands could be used. Furthermore, as the waters spread they tended to finger out over the lands through shallow and constantly shifting channels which gullied the surface and limited the used of the land. The trial court in its opinion appearing in the record said: That the construction of the new channel and its levees deprived Truslow and King of access to public highways during all the rainy months of the year, forcing the use of circuitous routes through property owned by others and increasing the distance to and from the lands, thus in effect and during the rainy season completely landlocking Truslow's property; that for these reasons the court considered the loss of access warranted severance damages in the total sum of $27,500; that from 1935 and up to and including 1949 there had been deposited on various parts of Truslow's property from 4 to 6 feet of soil, consisting of silt and sand, deposited from flood waters of Cache Creek; that this soil was properly classified as Yolo fine sandy loam carrying a Storey index rating of 100, so that, so far as the soils themselves were concerned which had thus been deposited, their character was of the very best; that these deposits covered a material part of Truslow's holdings; that the soil on the remainder was inferior to the deposited soil and contained various degrees of alkalinity; that the previous channel of Cache Creek had tended to flow in various "fingers" toward the lower end of the Truslow lands, causing many erosion gullies on the surface; that this made the land unsuitable

for farming; that the construction of the new channel and training levees on the condemned lands reclaimed "all of the remainder of the Truslow lands"; that the gullies could be cleared and leveled and the entire remainder of his lands could be farmed and "will be comparatively free from floods." The court further stated that it considered the benefits thus derived by reason of the construction of the new channel and training levees far outweighed the damage by loss of access and in its opinion enhanced the value of Truslow's remaining lands by at least $50,000 so that there was no damage by severance.

In support of his motion appellant Truslow pointed to various matters appearing in the record, including the findings of the trial court which briefly reflected the matters contained in the opinion which we have above set out and asserted that from these matters and from the testimony of the respondent district's witnesses he had from the beginning been led to believe that the new channel and training levees would be permanent in nature and perpetually maintained; that, so believing, they made no attempt to show the contrary and that in effect both he and the trial court were of the impression when the evidence was concluded that the channel and training levees were of such nature; that the trial court based its findings of benefits offsetting severance damage upon this assumption of permanency of the new channel and its training levees. This belief, say Truslow and his counsel, continued until it developed, after the rendition of judgment, that the easterly training levee along the new channel was being breached by the flood waters as they flowed through the channel, and the waters were again going over the lands supposed to have been reclaimed by the levee, so that the benefits found by the court to have been conferred upon the remaining lands outside the condemned lands were not being enjoyed. This matter was taken up with the respondent district and meetings were held with those representing the respondent, information was sought and obtained from the federal authorities as to the intended permanency of the training levees and as to whether or not there was any obligation on the part of anyone to repair the levees if and when breached. The result of this was that the position was taken by the state and federal authorities that, in effect, training levees were training levees and that these had never been intended or represented to be anything other than training

levees; that in the normal use of these levees and their enclosed channel the waters would for a considerable time be discharged toward the southerly limits of the basin, gradually filling that area with deposits; that the waters so in part desilted would spread over the lower-lying portions of those lands in the basin, including the lands of Truslow, but that, being deprived of their velocity, they would not erode or gully the surface of the lands over which they flowed and, after the period of flood, those lands would emerge in shape available for agricultural use. But, said these authorities, by the very nature of the purpose of the settlement basin and by the intended and only function of the training levees, the time would come when the lower end of the easterly levee in particular would either be artificially or naturally breached and leveled so that the waters might flow out at more northerly points and ultimately the full capacity of the settling basin be thus utilized. It is the position, therefore, of Truslow and his counsel that this impermanency of the training levees, and the resultant diminishing of the beneficial effects that would have been derived from permanent levees, were matters which they were not aware of until after the trial and rendition of judgment, and that their ignorance thereof was in effect induced by the noted contents of the resolution concerning the type and use of the training levees and the enclosed channel, and by the testimony of respondent district's witnesses with respect to the benefits that would be conferred by their construction.

We think that it cannot be fairly said that there was any concealment of either the purpose or effect of the training levees and their enclosed channel. The resolutions stated that it was necessary to condemn an additional right-of-way and easement "for the construction and perpetual maintenance" of a new channel and training levees, but this is far from stating or representing that the condemnor would perpetually maintain the channel and its enclosing levees. The language of the resolution defined and was intended to define the measure of the rights sought and surely did not cast and could not have been considered to have cast any contractual obligation with respect to maintenance of the works to be constructed. The complaint alleged and the trial court found that it was necessary for the respondent district to condemn such a right of way and easement, but this finding again concerns the measure of the rights to be taken. There was, of course, no statement in the complaint that there were either

any severance damages to be paid or any benefits to be offset thereto. These were matters which developed when proof was made of severance damage from loss of access, and respondent district introduced proof of offsetting benefits. The trial judge who heard this case has long held his office in a county where problems of flood control and reclamation have for generations confronted the people of the region and we cannot believe that this experienced jurist did not thoroughly understand the functions of training levees and the functions of the settling basin or that he lacked any appreciation of the fact that the exercise of these functions would necessarily result in a progressive change of conditions with respect to the lands within the basin. We are unable to believe that he failed to realize and appreciate the very things of which Truslow and his counsel claim they were ignorant or that his findings as to benefits were based on a mistaken belief the training levees were any more permanent than the previous ones had been. In fact, as stated, we do not believe that evidence as to the intended use of the training levees and the settling basin, had it been specifically introduced into the record, would have advised the trial court of anything that was not already within that court's knowledge. We think, therefore, that no cause has been shown for this court to grant any part of the motion made.

### APPEAL OF RECLAMATION DISTRICT No. 2035

Reclamation District 2035 was joined as a defendant, the allegation in respect of it being that it claimed some interest in or lien upon the property to be taken. The district filed an answer, alleging that it had levied upon the lands within its borders an assessment for defraying the cost of construction and maintenance of general reclamation works and had thereafter issued bonds against the assessment; that thereafter refunding bonds had been issued, which were outstanding in the principal sum of $2,000,000; that these bonds would not begin to mature until January 1, 1955, and thereafter would mature serially over a period of 40 years; that the lands to be taken constituted parts of three parcels of land which had thus been assessed; that on the three assessment tracts the total of liens was the sum of $83,292.96; that one tract had been assessed at an average of $59.29 per acre, another at $65.18, and the third at $67.88. Roy E. Cole, Treasurer of the County of Yolo and ex-officio treasurer of

the reclamation district, also answered, setting up the facts we have recited. Both defendants asked the same relief, viz.: that the money awarded for the easements taken up to the total amount of the assessments upon the three assessment parcels be paid to Cole as trustee for the district and the bondholders, to be kept by said trustee and used for the payment of bond principal and interest. At the trial no issue was presented as to the truth of the factual allegations in the answers. The trial court made findings conformable to these factual allegations. It was further found that the value of the easements condemned across the three assessment tracts totaled the sum of $50,000; that the construction of the new channel and the training levees reclaimed the remainder of the parcels; that the benefits conferred by reason of such construction would enhance the value of lands in the three parcels outside the easement area by at least $50,000, i.e., by a sum greater than the award; that although the assessment liens were against all rights and interest in the property affected, yet the bondholders had suffered no diminution in the value of their security, and that although the security underlying the bonds had been cut down as to quantity of land by reason of the rights condemned, the improvement in the quality of the remaining land more than offset and more than compensated the loss in quantity; that the claim of the district and the treasurer against the amount awarded for the taking should be denied; and that "the rights of the . . . lien holders should not be considered on an acre basis for the reason that neither the reclamation district nor the bondholders are damaged by reason of the construction of the improvements by the plaintiff." Judgment denying any relief to the district and its treasurer was entered and they appeal.

At the trial the evidence introduced by the appellants consisted of a showing that of the three assessment parcels affected, one contained 307 acres assessed for $18,154.55, the second contained 332 acres assessed for $21,690.44, and the third contained 640 acres assessed for $43,447.97. It was further shown that of the first parcel 15.82 acres lay within the right-of-way condemned, of the second parcel 72.73 acres lay therein, and of the third parcel 145 acres lay therein. On the assumption that the total assessment on each parcel could be considered as having been uniformly distributed over the entire parcel, the appellants computed what they called the amounts "to be paid by the Truslow lands on the

condemned portion." They thus arrived at a total to be paid on the condemned portions of the tracts of $13,612.70, to which sum, again by computation, they added the amount of interest that would accrue upon that sum at the rate of 6 per cent, as stated in the bonds, over the period of 40 years. They came out with a total of $32,806.60, which sum they argued in the trial court and argue here, was the sum which ought to have been taken from the gross award and paid into the hands of Mr. Cole, as trustee, with power in him to apply from time to time such amounts thereof as might be necessary to meet calls against the three parcels. The basic assumption which the appellants make is falacious.     It cannot be assumed that when the viewers assessed the three parcels of land they considered as to each parcel that each unit thereof, whether it be a 10-acre unit or a 1-acre unit or a unit of still smaller area, would be equally benefited by the construction of the reclamation works. The assumption cannot be made because the statute governing the acts of the assessors in effect directs that it shall not be made. Such assessments are based upon *benefits to each tract* of land that is selected as a unit of assessment. The assessments were made under the direction of Political Code, section 3456, which section now appears in the Water Code, sections 51231 to 51238. These sections require that assessment commissioners "assess the estimated cost of the reclamation plan upon the district land . . ." by fixing and assessing upon the district land the sum estimated to be the cost of the reclamation plan, apportioning that sum according to the benefits that will accrue to *each parcel* by reason of the expenditures of the sums of money required for the doing of the work according to the adopted plans. These parcels may and do vary in size from small parcels up to areas of 640 acres. In this case they varied from 307 acres to 640 acres. It would be rare, indeed, that a parcel of land was uniform throughout in character, fertility, drainage and all the other characteristics that go to make up the utility and the value of a parcel of land. On the contrary, it would almost always be found that parcels of land selected for assessment purposes would vary within themselves in such matters. Thus some parts would be low and ill-drained, others affected with alkalinity, while others would consist partly of sand or other inferior soil. Nevertheless, under the statutory mandate the commissioners of assessment viewing the parcel as a whole and taking

into consideration the variations of these characteristics within it and comparing it with all other assessment parcels in the district, must levy such a sum of money against the parcel as a unit as will meet the statutory requirements that the benefits, tract by tract, shall be proportionately equal. An assessment so levied cannot afford any foundation for the basic assumption made by the appellants. Nor was there any evidence introduced from which the trial court could arrive at an apportionment of the levy made upon each tract so that the land condemned and the land left could be found to justly bear designated portions of the total assessment. The specific relief, therefore, for which the appellants argue, that is, that the sum of $32,806.60 be taken from the total award and paid over in trust to the county treasurer could not, on the record here, be granted.

But the prayer of the answer of each of the appellants was not in harmony with the arguments as to what portion of the award should be turned over. On the contrary, the appellant district and its treasurer asked that the entire award be turned over to the treasurer up to the amount necessary to answer calls against the total assessments upon the three tracts as the bonds and their interest matured, that is, up to the sum of $83,292.96. This sum consisted, as we have said, of principal and anticipated interest. The granting of this relief could have absorbed the entire award made. Neither the owner Truslow, nor his tenant King, could have received anything.

Appellants, respecting their rights to make demands upon the money paid into court by the condemnor, refer us to text and case law involving rights of mortgagees, such as *City of Vallejo* v. *Superior Court*, 199 Cal. 408, 417 [249 P. 1084, 48 A.L.R. 610], *Los Angeles Trust & Sav. Bank* v. *Bortenstein*, 47 Cal.App. 421 [190 P. 850], 29 C.J.S., "Eminent Domain," section 200, page 1107. We quote the following from that text:

". . . It is well settled, however, that where there are liens on the land taken or injured, the court may allow the condemnor to pay the award into court for the benefit of the owner and the lienholders, although the lienholders were not made parties to the condemnation proceedings. The award in such case is a substitute for the land taken, and the lienholder may have his lien satisfied out of the fund awarded and paid into court. This protection extends to judgment liens and to tax liens; and, where only a portion of the

property subject to the lien is taken, the lienor is entitled to satisfy the entire amount of his lien from the award.''

That the relief which appellants asked in their pleadings has been granted in like cases cannot be gainsaid. So in *Boyle* v. *Middleburgh Realty Co.*, 75 Ohio App. 368 [62 N.E.2d 262, 264], it was said:

''. . . Where the state acquires by condemnation . . . a part of a tract on which the taxes have become delinquent, the amount paid by way of compensation for the land so acquired is first to be applied to the payment of all of the delinquent general taxes and there can be no apportionment of any part of such delinquent taxes to the unacquired residue.''

Continuing, the court said: ''It is obvious that no distinction can be drawn between the portion of the special assessments which have accrued and are unpaid and delinquent general taxes. The same reasons which cause us to deny apportionment in the case of liens of general taxes apply with equal force to accrued special assessments. The question then remains whether a court in distributing the fund received in a condemnation proceeding for a portion of a tract of land bearing special assessments may apportion the assessments payable in the future between the land appropriated and the residue.''

After noting that a statute of Ohio authorized apportionment of taxes on land when a part of the parcel taxed is conveyed away and after stating that the statute provided the only statutory method for such apportionment, the court continued:

''It is our opinion that the provisions of [the statute] which empower 'the authority certifying such assessments' . . . to make an apportionment of special assessments at the request of the county auditor 'whenever a portion or portions of a tract or parcel of real estate [bearing unpaid special assessments] is conveyed to another owner or other owners' can not be construed so broadly as to authorize the court to make an apportionment of the unpaid special assessment liens in this case.

''Likewise, it is our opinion that the court can not base such an authority on its general equity powers. The installments of the special assessments to become due in the future are as truly liens on the benefited property as are delinquent taxes or assessments. Therefore, when a part of the property

bearing special assessments is acquired by a public authority, it becomes the duty of the court in distributing money paid into court by way of compensation to pay not only the special-assessment liens already accrued but also to pay, as provided in Section 5677, General Code, or to set aside a sufficient sum to pay, the assessment liens to become due in the future before making any payments from the fund to the land-owner.''

In *Pomona College* v. *Dunn,* 7 Cal.App.2d 227, 232 [46 P.2d 270], the court, again speaking of mortgage liens, said:

''. . . It must be conceded at the outset that the right of a mortgagee in a proper case to subject an award made to the land owner as compensation for a part of the mortgaged premises taken through the medium of eminent domain proceedings to the lien of his mortgage is not open to doubt. Under the familiar doctrine of equitable conversion the award is considered as land and the mortgagee is entitled to so regard it and to have recourse to it in satisfaction of the mortgage lien.''

In *Los Angeles Trust & Sav. Bank* v. *Bortenstein, supra,* at page 423, it is said:

''. . . It is a well-recognized rule of equity, based upon the doctrine of equitable conversion, that when land is taken for public use, the money awarded for such land remains, and is to be considered, as land in respect to all rights and interests relating thereto. The money, in such cases, is deemed to represent the land, and is applied in equity to discharge the liens upon it, precisely in accordance with the legal or equitable rights of creditors or encumbrancers in respect to such land.''

But it cannot be said that in every case the whole award up to the total lien must be paid to the lienholder or set aside for his benefit. It stated in 18 American Jurisprudence, ''Eminent Domain,'' page 868, section 235, ''Mortgages,'' that:

''. . . The view obtaining in a majority of jurisdictions is that, where mortgaged land is taken or damaged in eminent domain proceedings, the mortgagee is entitled *either* to the whole of the award made for the condemned land, *or to a share thereof* to the extent of his interest or damage. Thus, where the whole of the mortgaged land is taken in the proceedings, the mortgagee is entitled to the entire award or at least to so much of it as is necessary to satisfy the mort-

gage indebtedness. Where only a part of mortgaged property is taken, the mortgagee is entitled, generally speaking, to only so much of the award as is necessary to compensate him for his interest in the part taken.'' (Italics supplied.)

It is stated in 58 American Law Reports 1539 in an annotation that:

''Where only a part of mortgaged property is taken in eminent domain proceedings, the mortgagee is entitled, generally speaking, to only so much of the award as is necessary to compensate him for his interest in the part taken.''

After stating the above general rule, the court said in *In re Dillman*, 276 Mich. 252 [267 N.W. 623, 625] :

''There is no controlling case upon the latter rule in this state. In *In re Widening Woodward Avenue*, 265 Mich. 87 [251 N.W. 379], the right of a mortgagee to participate in an award was not challenged. In *Detroit, B. C. & W. R. Co.* v. *First National Bank of Yale*, 196 Mich. 660 [163 N.W. 97], where only a small part of the premises was taken, the court divided evenly; four justices denying the mortgagee the award *on the ground his security had not been impaired by the taking*; and four holding him entitled to the award on the ground a mortgagee is entitled to all the security covered by his mortgage and the court cannot release part of it on appraisal.

''. . . *Under any circumstances, a mortgagee has sufficient right to the award to preserve his security against evident or established impairment.*'' (Italics supplied.)

As to rights in respect of taxes where property is taken in eminent domain an annotation to 79 American Law Reports, 116 et seq., cites many cases and, speaking quite generally, the approach to the problem as adopted in the cases cited is about the same as in the case of mortgages and other liens, that is, that the holder of the liens is entitled to have his interest protected and for that purpose the court may resort to the gross award paid into court by the condemnor after its amount has been fixed in the proceedings.

██ If a trial court has the power, and we think it has, to measure the amount to be set aside to protect lienholders, by the need for such protection, then this power includes power to find from the facts that no protection is needed, and to refuse for that reason to set aside any fund at all.

As we have seen, the trial court in this case, having found from the evidence that the security of the assessment liens on the parcels involved had been in no wise diminished, denied

any relief to the appellants and refused to set aside any part of the award ordering the whole thereof to be paid to the landowner and his tenant. The research of counsel and this court has not revealed any case in this state directly bearing upon the power of the trial court to refuse relief upon the grounds stated. However, we think the power exists in a proper case. In so holding we rely somewhat upon the factual situation here.

The statute contemplates that, when bonds are issued against assessments spread over the lands of a reclamation district in order to obtain money to defray the cost of general reclamation works, one of the main purposes in providing statutory authority for such financing is that by the length of time over which the obligation to pay the assessments is made to run full opportunity will be given to those who own the land to meet the charges out of profits from the use thereof over the years. The bonds here involved were issued in 1936, with no principal payments required until 1955. In that year and for 40 years thereafter 1/40th of the bonds or 2½ per cent of the principal bonded indebtedness matured each year. The bonds were non-callable and were based upon a contract between the bondholders, the district and the owners of the land assessed, whereunder the rate of maturity and in general the contractual rights of the parties could not thereafter be altered, even by legislation. (*Hershey* v. *Cole,* 130 Cal.App. 683 [20 P.2d 972].) It is said in *Hershey* v. *Cole* that the bondholders have the contractual right to have the calls made and the bonds paid at the stipulated maturity rate. Correlative to this right is that of the landowner to have the maturity rate observed so that in fulfillment of the general statutory purpose he will not be compelled to pay in advance. We think it would be inequitable for the court to take from the owners who are otherwise presently entitled to compensation for the loss they have suffered a sufficient sum to pay the principal of the bonds outstanding, and a further sum sufficient to defray interest charges for the full term of the bonds when, under the facts presented, the bondholders have no need for such action. We think the court here was faced with a situation where it was empowered to say, first, that the relief to be accorded the appellants in respect of the assessment liens should be measured by the need for that protection, and, next, that where the court was satisfied from the evidence no protection was needed it was within the court's power to refuse to set aside any funds for that purpose.

The motion to take evidence before this court is denied, and the judgment is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied June 25, 1954, and the following opinion was then rendered:

THE COURT.—■ On petition for rehearing appellant Truslow points out that this court did not in its opinion dispose of his contention that he was entitled to have the award in his favor modified by the addition thereto of interest from the time when, prior to trial and judgment, possession of the property was taken by the condemnor to the time when the award in his favor was paid into court for him. It has been held that just compensation for property taken ought to include the value of the loss of use arising where possession is so taken and that this value may be measured by legal interest at the rate of 7 per cent per annum for that period upon the award. (*Metropolitan Water Dist.* v. *Adams,* 16 Cal. 2d 676 [107 P.2d 618]; see also *Los Angeles County Flood Control Dist.* v. *Hansen,* 48 Cal.App.2d 314 [119 P.2d 734].) This modification cannot be made in favor of appellant Truslow because the reason of the rule under which it is granted does not here apply. Interest is allowed on the theory that where such prior possession is taken the one entitled to the use of the property will not be adequately compensated by an award of damages for the value of the property taken. Truslow's interest in the property taken was a reversionary interest, he having leased the land to King. He, therefore, was not entitled to the use of the property and since, as has been seen, the taking of a part of the leased property did not abrogate the lease, even pro tanto, Truslow has suffered no loss through the prior possession taken by the condemnor. That loss, if any, has fallen upon King. We cannot, therefore, modify the award to Truslow.

King has throughout been a respondent in the appeals taken by Truslow and by the reclamation district. It is a matter of grave doubt, therefore, he not having appealed from the judgment fixing his award, that this court has appellate jurisdiction to modify his judgment by adding interest to the award. But if we assume such jurisdiction exists we could not upon this record so modify his judgment. The first time that he made the request was when he filed his answer to

Truslow's petition for a rehearing, in which he opposed the granting of that application. Noting apparently that Truslow was asking an award of interest, King took the position that his status was identical with Truslow's and he, therefore, asked this court to modify the judgment in his favor by adding interest thereto. We have nothing before us to tell us the status of the judgment in favor of King which he, as respondent, seeks to have us modify. For aught that appears here that judgment may not belong to him, or may have been satisfied, in which latter event it would no longer exist for purpose of modification. The only information we have upon the matter comes through the contention on appeal by Truslow that during the time intermediate the trial and judgment King had assigned all of his interest in the award made to him. Nowhere has this assertion been controverted by any party to this record. We deny King's application for modification on the ground that it comes too late and that in the state of the record no basis exists for such modification.

Appellant's (Truslow) petition for a hearing by the Supreme Court was denied July 21, 1954.