454

[Civ. No. 23617.   First Dist., Div. Three.   May 24, 1968.]

URBAN RENEWAL AGENCY OF THE CITY OF MON-
TEREY, Plaintiff and Respondent, v. TERRY COOPER
HACKNEY et al., Defendants and Respondents; TRAV-
ELODGE CORPORATION et al., Defendants and Ap-
pellants.

Flint & MacKay and John C. Argue for Defendants and
Appellants.

Richard J. Dormody and A. Matthew Raggio for Plaintiff and Respondent.

Abramson & Church, Muller, Pia & Simmons, Jacob Abramson, John P. Muller and Raymond H. Simmons for Defendants and Respondents.

BROWN (H. C.), J.—The Urban Renewal Agency of the City of Monterey instituted this action in eminent domain against Terry Cooper Hackney, Martha Cooper Votaw, and Alicia Orcutt (owners), the owners of an unimproved point of land in Monterey. Joined as defendants in the action were the Travelodge Corporation, J. Dustin Smith and Elizabeth M. Smith, who claimed a leasehold interest in the property. The trial proceedings were bifurcated in order to determine whether the Travelodge or the Smiths (appellants) had any interest in the subject real property, by reason of their purported lease before considering the question of compensation. The trial court sitting without a jury found the purported lease to be void because of uncertainty; because it violated the rule against perpetuities; because it was abandoned; and because of impossibility of performance. The court entered judgment that Travelodge and the Smiths had "no right, title, interest in or lien or charge against, or leasehold interest in . . ." the parcel. Owners and the Agency then settled on a condemnation award of $175,000, and judgment was entered in favor of the owners and against the Agency in that amount. Travelodge and the Smiths appeal.

The facts: On December 2, 1958, the City of Monterey passed a resolution forbidding construction on a certain area (including owners' land) overlooking Fisherman's Wharf in Monterey. In February of 1960 the Smiths, who desired to build and manage a motel (pursuant to an oral agreement with the Travelodge Corporation), discussed with the owners the possibility of leasing the owners' land as a site for the motel. The owners advised the Smiths that the property was subject to the city's freeze on construction in the area, and that building permits had been applied for in the past without success. Although informed of the difficulty, if not impossibility, of obtaining permits, Smith convinced owners that they had much to gain if the motel could be constructed and nothing to lose if a permit was not granted. In April of 1960 Smith presented to the owners a prepared Travelodge lease form, which had not been executed by Smiths or Travelodge. Some of the material terms of the form lease were as follows:

The term was 49 years, commencing on the day the lease was recorded in Monterey County. The lease was to be placed in escrow with the Monterey Title Company, accompanied by $1,000 deposit from the appellants to be applied to rent. Travelodge agreed to submit plans and specifications to be approved by owners for construction of the motel within 60 days after the execution of the lease. Rent was to be $10 per month per unit, commencing upon the recordation of the lease, and 7½ percent of the gross receipts after the motel went into operation. The lease also contained provisions relating to construction, financing, keeping of records, insurance and taxes.

The owners made a significant change in the lease form. They eliminated a clause by which they would have warranted that the existing zoning on this property permitted the construction of a motel. The lease was then executed by the owners in the presence of a notary and immediately mailed to the Travelodge Corporation in San Diego.

On July 5, 1961, an Urban Renewal Plan was adopted for the area including the owners' parcel. Attempts by Smith to obtain a building permit or to secure the permission of the Urban Renewal Agency to construct a motel on the site failed. Travelodge thereafter found another location outside the Urban Renewal area and constructed a motel there with Smith as the manager. Travelodge executives, however, testified it was not unusual to have more than one motel in a city, and they remained ready at all times to build a motel on owners' property if a permit could be secured.

There was conflicting evidence as to when Travelodge signed the purported lease after receiving it from owners in 1961. However, there was sufficient evidence to support the court's finding that it was signed in 1964, after the condemnation action was commenced. The evidence is clear, moreover, that communication of Travelodge's acceptance and signing of the lease as altered by the owners was not accomplished until an executed copy was delivered to owners in April of 1964. And it is undisputed that the copy of the lease received by owners was undated and the signatures of Smith and Travelodge representatives did not bear a notary's acknowledgment. The Urban Renewal Agency had instituted this action to condemn the property on August 1, 1963.

The trial court found as facts that: (1) Appellants "expended no money in connection with the claimed lease . . ."; (2) appellants made no payments of rent or taxes in

connection with the lease; (3) Travelodge did not take posses- sion pursuant to the terms of the lease; (4) Travelodge did not open an escrow, as it normally would have done, because a building permit was not available; (5) the lease was never recorded and no deposit was made; (6) from December 2. 1958 on, building permits were not issued for the area in question; (7) appellants knew before either party signed the lease that such a ''freeze'' was in effect, and for this reason, appellants searched for and found another site and built a motel there; (8) *the intent of the parties to the lease was that the ''purported lease would be without any force and effec' whatever . . .''* (italics added) *unless a building permit was obtained by Travelodge*; (9) no building permit was ever obtained; (10) only after the condemnation action was com- menced did appellants ''assert any claim, right or interest in . . . [the owners' property] pursuant to said alleged lease''; (11) ''Said lease fails to provide a date certain on which THE TRAVELODGE CORPORATION would commence construc- tion of the motel or on which construction of said motel would be completed. Said lease further fails to provide agreement on plans and specifications to be followed in construction of said motel. The lease fails to provide the commencement date of the lease term, time for payment of rent or date of termina- tion of the lease term.'' There was ample evidence in the record to support these findings, with the possible exception, not here material, of the first one.

The question presented is: Did the trial court err in hold- ing that appellants had no interest in the subject property? We conclude that it did not.

■ In our view, the crucial finding of the trial court is that ''The intent of the parties . . . was that the purported lease would be without any force and effect whatever unless a building permit was obtained for . . .'' the parcel by Trav- elodge. The finding is supported by the terms of the lease itself, and by extensive and uncontradicted extrinsic evidence which was properly admitted to explain the intent of the par- ties. (See *Masterson* v. *Sine*, 68 Cal.2d 222, 225-226 [65 Cal.Rptr. 545, 436 P.2d 561].) The facts show that appellants were fully aware of the property freeze and the policy adopted by the authorities in Monterey to refuse to grant building permits in view of the likelihood of the property being taken over by the Urban Renewal Agency. The owners advised appellants Smith at the outset that prior application for permits had been denied. Because of those prior denials,

the owners eliminated the provision by which owners warranted that the property was zoned to permit construction of a motel. The action of appellants discloses that unless a permit to build was granted they had no intention of becoming obligated to pay rent or perform any other terms of the lease.

None of the conditions precedent to the performance of the reciprocal promises contained in the lease occurred. Appellants failed to deposit the lease in escrow and failed to make the required $1,000 deposit on rent. Appellants also prevented the commencement of the terms of the lease by failing to record it.

Appellants' purported acceptance or communication of their acceptance in April of 1964 occurred subsequent to the institution of the condemnation proceedings and could not thereafter create an interest or change the value of the property. ". . . No improvements put upon the property subsequent to the date of the service of summons shall be included in the assessment of compensation or damages." (Code Civ. Proc., § 1249.) (See also *Sacramento etc. Drainage Dist.* v. *Truslow,* 125 Cal.App.2d 478 [270 P.2d 928, 271 P.2d 930].)

It is, therefore, concluded that the parties intended to create a leasehold interest in the property only in the event a building permit could be obtained for the construction of the motel. This event did not occur. ■ The appellants, having failed to execute the lease prior to the institution of the eminent domain proceedings, together with appellants' failure to perform the conditions precedent set forth in the lease, rendered the document a nullity.

Since we rest our decision on these grounds, it is unnecessary to consider the contention of appellants that the trial court's reasons for awarding judgment were in error.

The judgment is affirmed.

Draper, P. J., and Salsman, J., concurred.